# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| BLUE CROSS BLUE SHIELD OF TENNESSEE, ) ) Plaintiff, ) ) v. ) ) ) ) BCS INSURANCE COMPANY, ) ) Defendant. ) | No. 06 C 7060 No. 07 C 2163 Judge Rebecca R. Pallmeyer |

## MEMORANDUM OPINION AND ORDER

Defendant BCS Insurance Company ("BCS") issued to Plaintiff Blue Cross Blue Shield of Tennessee ("BCBST") Directors and Officers Liability Insurance Policy No. D/O 991-390 (the "Policy"). In the Policy, the parties agreed to binding arbitration of "[a]ny controversy arising out of or relating to this Policy." BCBST filed a demand for arbitration under the Policy in October 2004. Although the parties began conducting discovery, two arbitrators withdrew from the panel in 2006. With the arbitration still pending, BCBST filed a Complaint in the Western District of Tennessee. BCS then filed a Petition to Compel Arbitration in this court (06 C 7060). BCBST's Complaint was transferred to this court (07 C 2163), which now considers BCBST's Motion for Summary Judgment of the Petition to Compel Arbitration and BCS's Motion to Compel Arbitration, Stay and Dismiss BCBST's Complaint. For the reasons set forth here, the court concludes that the Policy's arbitration clause is valid. BCBST's motion for summary judgment is therefore denied, and BCS's motion to compel arbitration is granted. The court stays proceedings on those counts of BCBST's Complaint alleging breach of contract and bad faith refusal to pay, and dismisses BCBST's claim for declaratory relief.

## BACKGROUND[1]

### A. The Coverage Dispute Between BCS and BCBST

BCBST is a Tennessee insurance corporation with its principal place of business in Chattanooga, Tennessee. (BCS's 56.1 Resp. ¶ 1.) BCS is an Ohio stock insurance company with its principal place of business in Oakbrook, Illinois. (*Id.* ¶ 2.) In 1999, BCS issued to BCBST the Policy, which has a coverage period from August 1, 1999 to August 1, 2002. (Policy, at BCS 008179, Ex. 1 to Compl.) The Policy includes an Insurance Company Errors and Omissions Endorsement, (*id.* at BCS 008206-09), which, according to BCBST, requires BCS to provide a defense and indemnity BCBST in litigation between BCBST and Guardsmark, Inc. ("Guardsmark"). That underlying litigation arose from BCBST's role as a third-party administrator for a medical plan issued by Guardsmark for a period of time prior to November 1, 1999, when Guardsmark terminated the relationship. (BCS's 56.1 Resp. ¶ 8.) In February 2001, Guardsmark filed a Complaint against BCBST, *Guardsmark, Inc. v. BlueCross BlueShield of Tennessee*, No. 01-2117 M/A (W.D. Tenn.), alleging that BCBST negligently administered Guardsmark's medical plan. (*Id.* ¶ 9-10; BCBST's 56.1 ¶ 9.) A trial commenced on March 22, 2004, and the dispute was ultimately settled on May 12, 2004. (BCS's 56.1 Resp. ¶ 11.)

By letters dated February 20, 2004; June 18, 2004; and July 22, 2004, BCBST submitted a claim to BCS under the Policy, demanding reimbursements for the combined cost of its defense against Guardsmark and the settlement amount, less a $250,000 deductible. (BCS's 56.1 Resp. ¶ 15.) BCS denied liability under the Policy for any portion of this claim. (*Id.* ¶ 16.) Because BCS

---

[1] The facts below are drawn largely from the parties' L.R. 56.1 statements. The Statement of Undisputed Material Facts in Support of BlueCross BlueShield of Tennessee's Motion for Summary Judgment will be cited here as "BCBST's 56.1." The portion of BCS Insurance Company's Response to BCBST's Statement of Undisputed Material Facts and Statement of Additional Undisputed Material Facts that admits facts set forth in BCBST's 56.1 will be cited here as "BCS's 56.1 Resp.," and the portion that introduces new facts will be cited as "BCS's 56.1." Where it admits facts, BlueCross BlueShield of Tennessee's Reply to BCS Insurance Company's Statement of Additional Undisputed Material Facts will be cited here as "BCBST's 56.1 Reply."

has refused to reimburse BCBST for the costs of its defense against and settlement with Guardsmark, BCBST seeks to recover as damages: $3,363,018.60 for BCS's alleged breach of contract, plus prejudgment interest; statutory damages under Tennessee Code § 56-7-105 for BCS's alleged bad faith refusal to pay; and certain attorneys' fees. (Compl. ¶ 41.)

### B. The Arbitration Proceedings

In this action, BCS seeks to compel arbitration of the parties' coverage dispute based on the terms of the Policy. The Policy contains an arbitration clause providing for arbitration of "[a]ny controversy arising out of or related to this Policy," which is to be conducted by a three-person panel. (Policy, at BCS 008204-05, Ex. 1 to Compl.) That arbitration is to be self-administered: the parties agree to follow the rules of the American Arbitration Association ("AAA") but decline to submit to the AAA's authority or jurisdiction. (*Id.*) Each arbitrator must be a current or former executive of a Blue Cross or Blue Shield Plan, and none may be a current or former officer or employee of either BCBST or BCS. (*Id.*) To create the arbitration panel, each party appoints one arbitrator. (*Id.* at 008204-05) The two party-appointed arbitrators then select a third arbitrator, who chairs the arbitration panel. (*Id.*) If the two arbitrators cannot agree on a chairperson for the panel, the Chief Judge of the local federal district court appoints the third arbitrator. (*Id.*) Arbitration takes place in Chicago, Illinois, unless the parties agree otherwise. (*Id.*)

On October 18, 2004, BCBST invoked the Policy's arbitration clause and filed a Demand for Arbitration with the AAA. (Letter from Houseal to BCS Ins. Co. of Oct. 18, 2004, Ex. 1 to Petition to Compel Arb. ("BCS Petition").) By a letter dated October 18, 2004, BCBST designated Joseph DuBray as its party-appointed arbitrator. (*Id.*) Mr. DuBray is General Counsel of Wellmark, Inc. ("Wellmark"), the Blue Cross Blue Shield licensed plan for the State of Iowa. (BCBST's 56.1 Reply ¶ 10.) According to BCS, at the time, Wellmark and BCS were opponents in a legal proceeding. (BCS's 56.1 ¶ 11.) BCS challenged Mr. DuBray as non-neutral, and BCBST

appointed a new arbitrator–Michele Calandro, the General Counsel for Blue Cross Blue Shield of Louisiana ("BCBSLA")–in December 2004. (BCS's 56.1 Resp. ¶¶ 18-19; BCBST's 56.1 Reply ¶ 13.) BCS designated Elia Germani, a former executive of Blue Cross Blue Shield of Rhode Island, as its party-appointed arbitrator. (BCS's 56.1 Resp. ¶ 20; BCBST's 56.1 Reply ¶ 25.) In January 2005, Ms. Calandro and Mr. Germani appointed Edward Kane as the third arbitrator and chairperson of the panel. (*Id.* ¶ 21.)

With the arbitrators empaneled, the parties proceeded with the arbitration process. On May 23, 2005, the parties agreed to a scheduling order, which was submitted to the arbitration panel for approval. (*Id.* ¶ 22.) In April 2006, the parties agreed to an amended scheduling order, which was also submitted to the arbitration panel for approval. (*Id.* ¶ 25.) For reasons not apparent in the record, the panel never acted on either proposed scheduling order. (*Id.* ¶¶ 23, 26.) Nevertheless, BCBST submitted its Statement of Claim on June 20, 2005, and BCS filed its response on July 15, 2005. (BCS's 56.1 Resp. ¶ 24.) BCBST issued information requests, and BCS responded to those requests. (BCBST's 56.1 Reply ¶ 3.) BCS served BCBST with requests to produce, and BCBST produced documents in response. (*Id.* ¶ 4.) During the week of May 2, 2006, BCBST deposed five BCS witnesses, including BCS President and CEO Daniel Ryan. (*Id.* ¶ 5.) BCS also attempted to schedule depositions of BCBST witnesses, but BCBST objected to BCS's request. (*Id.* ¶ 6.) Before depositions of any BCBST witnesses could occur, on June 4, 2006, BCBST proposed a thirty-day moratorium on the arbitration proceedings so that BCS and BCBST could engage in a settlement conference. (*Id.* ¶ 7.) This settlement conference failed. (*Id.* ¶ 8.) On August 8, 2006, BCBST sent BCS a proposed Third Amended Scheduling Order, which contemplated a final hearing in July 2007. (*Id.*)

C.  **Complications with the Arbitration Panel Prompt this Litigation**

After this point, problems arose with the composition of the arbitration panel. In a letter

4

dated October 12, 2006, BCS notified BCBST that "there has been a change in circumstances that we believe requires the withdrawal of Michele Calandro as an arbitrator in this matter." (Letter from Hackett to Schwartz of Oct. 12, 2006, Ex. 3 to BCS Petition.) Specifically, BCS noted that Ms. Calandro was General Counsel for BCBSLA, which had retained joint counsel with BCBST in lawsuits referred to by the parties as the *Solomon* and *Thomas* matters. (*Id.*)[2] In the *Solomon* and *Thomas* matters, BCBSLA and BCBST seek coverage from BCS. (Westermeyer Aff. ¶ 15, Ex. 1 to Reply in Supp. of BCS Ins. Co.'s Mot. To Compel Arb., Stay and Dismiss ("BCS Reply").) Through this joint counsel, BCBSLA and BCBST have also threatened to bring allegations of bad faith against BCS. (Letter from Hackett to Schwartz of Oct. 12, 2006, Ex. 3 to BCS Petition.) BCS therefore objected that "BCBSLA's adversity to [BCS] and its simultaneous alliance with [BCBST] in a coverage dispute claiming that [BCS] is acting in bad faith means that Ms. Calandro is no longer impartial and independent under . . . the AAA's Commercial Arbitration Rules and Mediation Procedures . . . ." (*Id.*)

BCS never received a response to the October 12 letter. (Letter from Pearlman to Calandro of Dec. 11, 2006, Ex. 4 to BCS Petition.) BCS sent an email dated December 11, 2006, directly to Ms. Calandro, requesting that she withdraw as an arbitrator.[3] (*Id.*) Ms. Calandro voluntarily withdrew as an arbitrator four days later. (Letter from Calandro to Pearlman of Dec. 15, 2006, Ex. 6 to BCS Petition.) BCBST has not replaced Ms. Calandro with another arbitrator. (BCBST's 56.1 Reply ¶ 18.) In the interim, by an email dated October 18, 2006, Mr. Kane withdrew as an arbitrator and chairperson of the arbitrator panel. (Email from Kane to Calandro et al. of Oct. 18, 2006, Ex. 2

---

[2] According to BCBST, this national litigation between health care providers and various Blue Cross Blue Shield plans are captioned *Thomas v. Blue Cross Blue Shield Ass'n*, Case No. 1:03-cv-21296-FAM (S.D. Fla. filed May 22, 2003) and *Solomon v. Blue Cross Blue Shield Ass'n*, Case No. 1:03-cv-22935-FAM (S.D. Fla. filed Nov. 4, 2003). BCBST's counsel in the *Thomas* and *Solomon* matters is not the same counsel representing it in this dispute.

[3] Copies of this letter were sent to Mr. Germani and counsel for BCBST.

to BCS Petition.) Neither party has offered any reason for Mr. Kane's withdrawal. Thus, Mr. Germani is currently the only arbitrator on the panel.

On November 20, 2006, BCBST filed claims against BCS in the Western District of Tennessee for breach of contract, bad faith refusal to pay, and a declaratory judgment that the arbitration clause in the Policy is void. *See Blue Cross Blue Shield of Tennessee v. BCS Ins. Co.*, No. 06-2791 Ma/V (W.D. Tenn.). Subsequently, on December 21, 2006, BCS filed a Petition to Compel Arbitration in this court. On April 12, 2007, Judge Samuel H. Mays, Jr. of the Western District of Tennessee transferred BCBST's claims against BCS to this court, where it was assigned to this court as a related action.

BCBST now moves for summary judgment in opposition to BCS's Petition to Compel Arbitration, Case No. 06 C 7060, arguing that the arbitration clause in the Policy is void. In response to BCBST's Complaint, in Case No. 07 C 2163, BCS moves to compel arbitration, stay BCBST's claims for breach of contract and bad faith refusal to pay, and dismiss with prejudice BCBST's claim for declaratory judgment. As explained below, the court concludes that BCBST's claim is arbitrable. Accordingly, BCBST's motion for summary judgment is denied, Counts I and II of its Complaint should be stayed, and Count III is dismissed.

## DISCUSSION

### A. Subject Matter Jurisdiction

The Federal Arbitration Act ("FAA") "provides for an order compelling arbitration only when the federal district court would have jurisdiction over a suit on the underlying dispute; hence, there must be diversity of citizenship or some other independent basis for federal jurisdiction before the order can issue." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 26 n. 32 (1983). Here, the parties are of diverse citizenship and satisfy the amount in controversy requirement.

6

## B. BCS's Motion to Compel Arbitration

"A party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court . . . for an order directing that such arbitration proceed in the manner provided for in such an agreement." 9 U.S.C. § 4 (2000). The Supreme Court has held that "questions of arbitrability must be addressed with a healthy regard for the federal policy favoring arbitration." *Moses H. Cone*, 460 U.S. at 24. Thus, courts should compel arbitration if there is: (1) a written agreement to arbitrate; (2) a dispute within the scope of the arbitration agreement; and (3) a refusal to arbitrate. *Zurich Am. Ins. Co. v. Watts Indus., Inc.* 417 F.3d 682, 687 (7th Cir. 2005).

BCBST never contests that there exists: (1) a written agreement to arbitrate; (2) a dispute within the scope of the arbitration agreement; and (3) a refusal to arbitrate. BCBST itself invoked the arbitration clause in October 2004 and has participated in arbitration proceedings since then. Instead, BCBST argues that the Illinois contract defenses of impossibility, commercial frustration, and unilateral mistake render the parties' written agreement to arbitrate invalid.[4] The FAA provides that written arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Thus, if proven, a state law contract defense will void the parties' agreement to arbitrate. *Doctor's Assocs., Inc. v. Casarotto*, 517 U.S. 681, 686-87 (1996); *see also First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995) (ordinary state law contract principles govern determination of whether a dispute is arbitrable). If, however, no Illinois contract defense is proven, the agreement to

---

[4] Without any discussion of choice of law principles, both parties have relied on Illinois state law regarding issues of contract interpretation. As neither party suggests a conflict with other potentially applicable substantive law, the court will apply Illinois law. *Gould v. Artisoft, Inc.*, 1 F.3d 544, 549 n. 7 (7th Cir. 1993) ("Where the parties have not identified a conflict between the two bodies of state law that might apply to their dispute, we will apply the law of the forum state . . . .").

arbitrate is valid and arbitration should be compelled. *We Care Hair Dev., Inc. v. Engen*, 180 F.3d 838, 844 (7th Cir. 1999).

To defeat BCS's motion to compel arbitration, BCBST must identify a genuine issue of material fact concerning the validity of the parties' arbitration agreement. *Tinder v. Pinkerton Sec.*, 305 F.3d 728, 735 (7th Cir. 2002); *737 N. Mich. Ave. Investors LLC v. Neiman Marcus Group, Inc.*, No. 06 C 6379, 2007 WL 1074905, at *3 (N.D. Ill. Apr. 5, 2007). This standard is analogous to that required of a party opposing summary judgment. *Tinder*, 305 F.3d at 735; *737 N. Mich. Ave.*, 2007 WL 1074905, at *3. "Just as in summary judgment proceedings, a party cannot avoid compelled arbitration by generally denying the facts upon which the right to arbitration rests; the party must identify specific evidence in the record demonstrating a material factual dispute for trial." *Tinder*, 305 F.2d at 735.

### 1. Impossibility

For its first defense, BCBST asserts that it is impossible for the parties to comply with the Policy's arbitration provision. (BCBST's Resp. to BCS Ins. Co.'s Mot. to Compel Arb., Stay and Dismiss ("BCBST's Resp."), at 10.) More specifically, BCBST claims that it cannot arbitrate its claims against BCS because the pool of potential arbitrators has been "effectively eliminated." (*Id.*)

To sustain the defense of impossibility, a party must show that an "unanticipated circumstance" has made "performance of the promise vitally different from what should reasonably have been within the contemplation of the parties." *Illinois-Am. Water Co. v. City of Peoria*, 332 Ill. App. 3d 1098, 1106, 774 N.E.2d 383, 391 (3d Dist. 2002). Furthermore, an impossibility defense requires that those unanticipated circumstances "were not and could not have been anticipated by the parties, that the party asserting the doctrine did not contribute to the circumstances, and that the party demonstrate that it has tried all practical alternatives available to permit performance." *Id.* To summarize, in order to resist arbitration on grounds of impossibility,

8

BCBST must show: (1) an unanticipated circumstance; (2) that was not foreseeable; (3) to which BCBST did not contribute; and (4) that BCBST has tried all practical alternatives. As explained below, the court concludes BCBST fails all of those tests.

First, BCBST has not shown the existence of "an unanticipated circumstance" that made its performance vitally different from what the parties reasonably expected. See *City of Peoria*, 332 Ill. App. 3d at 1106, 774 N.E.2d at 391. BCBST contends that BCS has adopted a "conflict of interest" standard that deems "any current or former Blue Cross Blue Shield executive of a plan connected to the *Thomas* and *Solomon* litigation . . . [to] lack the required impartiality and independence required by the parties' arbitration provision." (BCBST's Resp., at 9.) Because so many Blue Cross Blue Shield plans are named as defendants in the *Thomas* or *Solomon* lawsuits, BCBST claims to find itself "at a loss to identify potential arbitrators who both conform to the Policy's requirements and satisf[y] BCS's interpretation of the conflict of interest standard designated under the Policy." (*Id.* at 10.)

A standard that disqualifies all potential arbitrators might well render arbitration impossible. Here, however, BCBST cries impossibility in response to a "conflict of interest" standard BCS has never invoked. Through its General Counsel, Michael Westermeyer, BCS disclaims the "conflict of interest" standard, explaining that BCS does not believe that an arbitrator must be wholly unconnected to the *Thomas* and *Solomon* lawsuits in order to be impartial and independent. (Westermeyer Aff. ¶¶ 1, 21, Ex. 1 to BCS Reply.) BCS refers to the parties who have retained joint counsel with BCBST and are threatening to pursue bad faith claims against BCS in the *Thomas* or *Solomon* lawsuits as the Bad Faith Plans. (*Id.* ¶ 20.) BCS's only *per se* objection is to the selection of an arbitrator who is a *current* executive of one of the nineteen Bad Faith Plans. (*Id.* ¶¶ 15-22.) Indeed, at the time BCS objected to Ms. Calandro serving as an arbitrator, BCS made it clear that its objection was based on her being the current General Counsel of BCBSLA,

a Bad Faith Plan. (Letter from Hackett to Schwarz of Oct. 12, 2006, Ex. 3 to BCS Petition.)[5] Thus, BCS has no *per se* objection to the selection of an arbitrator from among the current or former executives of any of the fourteen plans involved in the *Thomas* or *Solomon* litigation, so long as they are not one of the Bad Faith Plans. (Westermeyer Aff. ¶ 22, Ex. 1 to BCS Reply.) Even with regard to the nineteen Bad Faith Plans, BCS has no *per se* objection to *former* executives serving as arbitrators. (*Id.* at ¶ 21.) In fact, BCS's own party-appointed officer is a former executive of the Rhode Island Plan, which is a defendant in the *Thomas* and/or *Solomon* litigation. (BCBST's 56.1 Reply ¶ 25.)

Notably, if BCS had invoked the "conflict of interest" standard to which BCBST objects, it would still be possible for BCBST to select an arbitrator to replace Ms. Calandro. There are approximately thirty-nine health insurance plans that are independent licensees of the Blue Cross Blue Shield Association (the "Plans"). (BCBST's 56.1 Reply ¶ 19.) According to BCS, only thirty-three of the Plans are BCS insureds who have asserted claims for coverage related to the *Thomas* or *Solomon* litigation. (Westermeyer Aff. ¶ 19, Ex. 1 to BCS Reply.) In other words, there are six Plans that have not asserted claims for coverage against BCS in connection with the *Thomas* or *Solomon* lawsuits. A current or former executive of any of these six Plans could be selected as an arbitrator even if the "conflict of interest" standard, as characterized by BCBST, were applicable. As a result, BCBST has failed to show that BCS's response to the *Solomon* and *Thomas* lawsuits makes it impossible for BCBST to perform under the terms of the arbitration agreement.

Second, BCBST has not demonstrated that it could not have foreseen the current situation. *See City of Peoria*, 332 Ill. App. 3d at 1106, 774 N.E.2d at 391; *In re Marriage of Corkey*, 269 Ill. App. 3d 392, 398, 645 N.E.2d 1384, 1389 (2d Dist. 1995). It is difficult to establish unforeseeability

---

[5] At the time that BCS objected to the appointment of Mr. DuBray as an arbitrator, he was the General Counsel of Wellmark, a Plan directly adverse to BCS in legal proceedings but not the *Thomas* or *Solomon* litigations. (BCS's 56.1 ¶¶ 10-11.)

because the general rule is that "where parties, by their own contract and positive undertaking, create a duty or charge upon themselves, they must abide by the contract and make the promise good, and subsequent contingencies, not provided against in the contract which render performance impossible, do not bring the contract to an end." *Joseph W. O'Brien Co. v. Highland Lake Constr. Co.*, 17 Ill. App. 3d 237, 241, 307 N.E.2d 761, 765 (1st Dist. 1974) (citation omitted); *see also Farm Credit Bank of St. Louis v. Dorr*, 250 Ill. App. 3d 1, 9-11, 620 N.E.2d 549, 554-55 (5th Dist. 1993) (finding no genuine issue of material fact existed to support an impossibility defense where defendants were aware that the interest rates for the loan at issue were variable and therefore fluctuation was foreseeable). Insurance companies frequently are involved in litigation, and they regularly submit their claims to their own insurers for coverage. According to BCS, the Blue Cross Blue Shield Association and member plans founded BCS to support the Plans with insurance products. (Mem. in Supp. of BCS Petition, at 2.) Thus, BCBST had reason to know that BCS insures most Blue Cross Blue Shield plans. While BCBST might not have foreseen two national class action lawsuits against several Blue Cross Blue Shield plans, it can be no surprise that coverage disputes have arisen between BCS and the member plans, arguably reducing the pool of impartial and independent arbitrators. BCBST has not explained why this reduction was not foreseeable, and its impossibility claims must fail as a result.

Third, BCBST has failed to demonstrate that, if an unforeseeable changed circumstance exists, BCBST has not itself contributed to that circumstance. *See City of Peoria*, 332 Ill. App. 3d at 1106, 774 N.E.2d at 391. As explained above, BCBST–not BCS–has propounded the "conflict of interest" standard. Indeed, BCBST–not BCS–has requested that Mr. Germani be withdrawn as an arbitrator in this lawsuit based on his status as a former executive of a Blue Cross Blue Shield plan named as a defendant in the *Thomas* and *Solomon* litigation. (BCBST 56.1 Reply ¶ 25.)[6] In

---

[6] BCBST contends that the arbitration agreement "evidences the belief of the parties
(continued...)

addition, BCBST elected to retain joint counsel with the nineteen Bad Faith Plans and to threaten to assert claims of bad faith against BCS in the *Thomas* or *Solomon* lawsuits. By doing so, BCBST has contributed to what it contends are reductions in the pool of impartial and independent arbitrators. There is no question, of course, that BCBST is within its rights to pursue its claims against BCS in the *Thomas* and *Solomon* matters while simultaneously pursuing its bad faith claims against BCS under the Policy. But under Illinois law, a party "cannot make performance impossible and then cry impossibility." *First Nat'l Bank of Chicago v. Atlantic Tele-Network Co.*, 946 F.2d 516, 521 (7th Cir. 1991). To the extent that BCBST's strategy in these contemporaneous lawsuits narrow the pool of impartial arbitrators, BCBST is precluded from claiming impossibility based on its own choices.

Fourth, BCBST has not demonstrated that it has tried practical alternatives available to permit performance of the agreement to arbitrate. *See City of Peoria*, 332 Ill. App. 3d at 1106, 774 N.E.2d at 391. BCS first informed BCBST that it believed Ms. Calandro was no longer an impartial and independent arbitrator in October 2006. BCBST made no response to that communication. If BCBST believed that BCS's objection unnecessarily narrowed the pool of arbitrators, it should have negotiated with BCS regarding the proper standard for impartiality of an arbitrator.

Nor is there any indication in that record that BCBST has even attempted to identify a replacement for Ms. Calandro. Yet there remains a pool of potential arbitrators, according to BCS: current and former executives from the six Plans not involved in the *Thomas* or *Solomon* lawsuits, current and former executives from the fourteen Plans who have not retained joint counsel with BCBST in the *Thomas* or *Solomon* cases, and former executives from the nineteen Bad Faith Plans. BCBST has not shown that it is precluded from appointing a replacement arbitrator from

---

⁶(...continued)
that former employees should be excluded from participating as arbitrators to the same extent as current employees." (BCBST's Reply Mem. In Supp. of its Mot. for Summ. J., at 8.) Thus, BCBST believes that Mr. Germani must be excluded as an arbitrator.

within that pool. All BCBST has shown is that the commencement of the *Thomas* and *Solomon* matters may make it more difficult to find a qualified arbitrator. This cannot sustain an impossibility defense. See *City of Peoria*, 332 Ill. App. 3d at 1107, 774 N.E.2d at 391 (rejecting impossibility defense where party failed to "show that performance, even if difficult, is impossible").

In support of its claim that this difficulty makes it "futile" for BCBST to attempt to appoint another arbitrator, BCBST focuses on two cases, both half a century old, and neither of which applies Illinois law. BCBST first cites *Johnson v. Harvey*, 44 Wash. 2d 455, 268 P.2d 662 (Wash. 1954) as a case in which the trial court permitted parties to proceed in litigation because the selection of arbitrators had become impossible. Neither party to the *Johnson* litigation, however, appears to have contested resolving the dispute by litigation rather than arbitration, and the Washington Supreme Court never considered the propriety of the trial court's decision to permit the litigation. Instead, the court considered a motion to strike witness testimony. *Johnson*, 44 Wash. 2d at 456-57, 268 P.2d at 662-63. *Johnson* has no bearing on the case before this court.

The second case upon which BCSBT relies is *Tureman v. Altman*, 361 Mo. 1220, 239 S.W.2d 304 (Mo. 1951). *Tureman* involved a dispute between two parties who were unable to determine the rental value of a piece of property. The contract between the parties contained an arbitration clause which required the parties to determine the rental rates through an appraisal process. After several failed attempts to determine the rate through appraisal, the court held that it had become impossible for the parties to comply with the arbitration agreement. 361 Mo. at 1230-31, 239 S.W.2d at 309-10. *Tureman* is factually far afield from this case. While the parties in *Tureman* made several attempts at arbitration over a period of more than twenty years, 361 Mo. at 1230-31, 239 S.W.2d at 309-10, the parties in this case are making their first attempt at arbitration and have spent only three years doing so. As a result, BCBST, unlike the appellants in *Tureman*, cannot show that "all practical alternatives available to permit performance" have been exhausted.

13

Because BCBST cannot satisfy any of the four elements of an impossibility defense, that defense does not void the parties' arbitration agreement.

### 2. Commercial Frustration

In the alternative, BCBST argues that the arbitration clause at issue is void under the doctrine of commercial frustration. Commercial frustration is an extension of the defense of impossibility. *Greenlee Foundries, Inc. v. Kussel*, 13 Ill. App. 3d 611, 616, 301 N.E.2d 106, 109 (1st Dist. 1973). The commercial frustration defense is "not to be applied liberally" and is only appropriate if a "rigorous" two-part test is satisfied. *Northern Ill. Gas Co. v. Energy Coop., Inc.*, 122 Ill. App. 3d 940, 952, 461 N.E.2d 1049, 1059 (3d Dist. 1984). To satisfy that rigorous test, a party must demonstrate that: "(1) the frustrating event was not reasonably foreseeable; and (2) the value of counterperformance has been totally or nearly totally destroyed by the frustrating event." *Id.* As discussed above, BCBST has not shown that BCS's involvement in the *Thomas* and *Solomon* litigations was a frustrating event or that it was unforeseeable. For these reasons alone, its commercial frustration defense must fail.

In addition, BCBST has failed to show that the value of its counter-performance was totally or nearly totally destroyed by the *Thomas* and *Solomon* cases. *See Springfield Oil Drilling Corp. v. Weiss*, No. 02 C 249, 2003 WL 22025006, at *7 (N.D. Ill. Aug. 26, 2003) ("Even if this Court were to find that the change . . . was not foreseeable, [defendant's commercial frustration] defense would still fail as the event did not totally or almost totally destroy the value of the parties' performance"). In exchange for agreeing to arbitrate its claims against BCS, BCBST sought, first, "a speedy and efficient resolution of the dispute." (BCBST's Resp., at 12.) Yet BCBST now argues that the "arbitration process . . . is no closer to resolution . . . than when" it commenced in 2004. (*Id.*) Any delay, however, is not due to either the *Thomas* or the *Solomon* lawsuit. Since BCBST demanded arbitration in October 2004, the parties empaneled arbitrators, the parties submitted two scheduling

14

orders to the panel, BCBST submitted its Statement of Claim and BCS responded, and the parties conducted discovery . (BCS's 56.1 Resp. ¶¶ 17, 19, 21-22, 24-25; BCBST's 56.1 Reply ¶¶ 3-5.) The allegedly frustrating event only came into play when BCS voiced its objection to Ms. Calandro as an arbitrator two years later, in October 2006. Significantly, to the extent the *Thomas* and *Solomon* lawsuits have stalled the arbitration since October 2006, BCBST has amplified that impact by refusing to appoint a replacement for Ms. Calandro. Without BCBST's foot-dragging, the parties might still enjoy a speedier resolution to their dispute than they would receive in court.

In exchange for agreeing to arbitrate, BCBST also sought the benefit of having its claim decided by insurance professionals who can better understand the nuances of the dispute. (BCBST's Resp., at 12.) The *Thomas* and *Solomon* lawsuits may make it more difficult to find such professionals who can serve as impartial and independent arbitrators, but BCS has presented evidence, which BCBST has not controverted, showing that there is still a significant pool of potential arbitrators. Under these facts, BCBST's assertion that "the parties no longer have access to arbitrators with an understanding of the Blue Cross Blue Shield insurance model," (*id.* at 12), is simply not true. Thus, BCBST has not shown that it has lost the benefits provided by having these Blue Cross Blue Shield plan executives on the panel. Because of this, its commercial frustration claim must fail.

### 3. Perceived Bias

In its Complaint, BCBST also suggests that the perceived bias of the arbitration panel voids the parties' agreement to arbitrate. (Compl. ¶ 38.) BCBST argues that it "has learned during the pendency of this arbitration that virtually every potential arbitrator in the contractual pool has an inherent conflict of interest that predisposes it to BCS's position" in that BCS "is owned in part by most, if not all, BlueCross BlueShield Plans." (*Id.*) Thus, BCBST claims that there is "at least the appearance of partiality in favor of BCS" in any arbitration panel the parties might select. (*Id.*) An

allegation that arbitrator bias will render an arbitration futile is not a basis for the court enjoin arbitration. *Smith v. Am. Arbitration Ass'n*, 233 F.3d 502, 506 (7th Cir. 2000). The proper way to raise a bias objection is by challenging the arbitration award, once the arbitration is complete. *Id.*; see also *ChampionsWorld, LLC v. United States Soccer Fed., Inc.*, 487 F. Supp. 2d 980, 991 (N.D. Ill. 2007) (holding that the FAA does not permit courts to "*prospectively* nullify a potential arbitration award" due to arbitrator bias) (emphasis in original); *Bellavia v. First USA Bank*, No. 02 C 3971, 2003 WL 22425008, at *3 (N.D. Ill. Oct. 20, 2003) ("if the arbitration panel in fact renders an award that is based on arbitrator bias, [plaintiff] has a remedy -- he may seek to vacate that award").

It appears that BCBST may be contending that the arbitration agreement should be voided for BCBST's claimed unilateral mistake: BCBST was wrong to believe that an impartial and independent arbitrator could be selected from the pool specified in the Policy's arbitration clause. (Compl. ¶¶ 38-39.) Under Illinois law, a defense of unilateral mistake applies where "the party seeking rescission shows by clear and convincing evidence that (1) the mistake is of a material nature; (2) the mistake is of such consequence that enforcement is unconscionable; (3) the mistake occurred notwithstanding the exercise of due care by the party seeking rescission; and (4) rescission can place the other party in status quo." *Siegel v. Levy Org. Dev. Co.*, 153 Ill. 2d 534, 545, 607 N.E.2d 194, 199 (1992) (citation omitted). The circumstances here do not support a unilateral mistake defense, however.

Accepting as true BCBST's allegations that it was mistaken about the appearance of impartiality of the arbitrators, (Compl. ¶ 38), that mistake does not, by itself, void the parties' arbitration agreement. *Cameron v. Bogusz*, 305 Ill. App. 3d 267, 273, 711 N.E.2d 1194, 1199 (1st Dist. 1999) ("If such reliance was a mistake, it was not the type of mistake that justifies rescission."). Indeed, even if BCBST's alleged mistake is found to be material, a unilateral mistake

defense requires that the mistake render the contract unconscionable. *Siegel*, 153 Ill. 2d at 545, 607 N.E.2d at 199; *Contempo Design, Inc. v. Chicago & N.E. Ill. Dist. Council of Carpenters*, 226 F.3d 535, 548 (7th Cir. 2000) (en banc). "A contract is unconscionable when, viewed as a whole, it is improvident, oppressive, or totally one-sided." *We Care Hair*, 180 F.3d at 843 (internal quotation marks and citation omitted) (applying Illinois law). Here, BCS has made no allegation of unconscionability, and under governing law could not make such a showing.[7]

An arbitration clause that permits the parties to select arbitrators who might appear to be (or even actually be) partial is not necessarily unconscionable as a matter of law. To the contrary, the FAA permits parties to select arguably partial arbitrators, if doing so serves their interests. *Sphere Drake Ins. Ltd. v. All Am. Life Ins. Co.*, 307 F.3d 617, 620 (7th Cir. 2002). In fact, parties frequently decide to balance industry expertise with impartiality: "Industry arbitration . . . often uses panels composed of industry insiders, the better to understand the trade's norms of doing business and the consequences of proposed lines of decision. The more experience the panel has, and the smaller the number of repeat players, the more likely it is that the panel will contain some actual or potential friends, counselors, or business rivals of the parties. Yet all participants may think the expertise-impartiality tradeoff worthwhile . . . ." *Id.* (internal citation omitted). Far from being unconscionable, in other words, this balance between expertise and impartiality is commonplace. *See id.*; *see also Teldata Control, Inc. v. County of Cook*, Case No. 02 C 7439, 2003 WL 1873921, at *2 (N.D. Ill. Apr. 14, 2003) (holding that threat of arbitrator bias does not render an arbitration agreement unenforceable as a matter of Illinois law). Even if the arbitration agreement permits an appearance of partiality on the arbitration panel, the clause is not unconscionable. Because BCBST has no additional basis for claiming that the appearance of arbitrator partiality constitute

---

[7] In the alternative, BCBST might demonstrate that BCS had reason to know of the mistake or caused the mistake. *Contempo Design*, 226 F.3d at 548. BCBST has made no allegations to this effect.

unilateral mistake, this defense must fail.

Finally, BCBST cannot show that it exercised due care in the formation of the contract clause, and any unilateral mistake defense must fail as a result. *Siegel*, 153 Ill. 2d at 545, 607 N.E.2d at 199; *Real Estate Value Co. v. USAir, Inc.*, 979 F. Supp. 731, 740 (N.D. Ill. 1997). There is no reason to believe BCBST could not have learned about the ownership of BCS when it entered into the Policy and therefore no basis for holding that BCBST exercised due care. Furthermore, if BCBST believed that the "appearance" of impartiality was material, it could have written this in to the contract. *Real Estate*, 979 F. Supp. at 940. Having failed to do so, it cannot now claim unilateral mistake and rescind the contract term.

### C. BCS's Motion to Stay Counts I and II of BCBST's Complaint

The FAA requires courts presented with an issue that is arbitrable under the terms of a written arbitration agreement to stay the trial of that issue, pursuant to a party's request, while the arbitration is conducted. 9 U.S.C. § 3; *see also Volkswagen of Am., Inc. v. Sud's of Peoria, Inc.*, 474 F.3d 966, 971 (7th Cir. 2007). In this action, BCBST's Counts I and II allege that BSC has breached the Policy and that BSC has committed a bad faith refusal to pay under the Policy. (Compl. ¶¶ 19-25.) Both counts will be stayed while the parties' dispute is arbitrated.

The Policy provides that "[a]ny controversy arising out of or relating to this Policy or the breach thereof shall be settled by binding arbitration . . . ." (Policy, at BCS 008204, Ex. 1 to Compl.) By its very words, this clause covers the allegations in Count I of BCBST's Complaint, which alleges that "BCS's refusal to pay BCBST's claim under the Policy constitutes a breach of BCS' obligations under the Policy." (Compl. ¶ 21.) In Count II, BCBST alleges that BCS's refusal to pay "BCBST's claim under the Policy was not in good faith." (*Id.* ¶ 24.) This claim clearly arises out of the Policy. Thus, the Policy's broad arbitration clause covers the allegations in Count II of BCBST's Complaint. *Cf. Kiefer Specialty Flooring, Inc. v. Tarkett, Inc.*, 174 F. 3d 907, 909-910 (7th

Cir. 1999) (holding that arbitration clause committing all controversies and claims "arising out of or relating to" the arbitration agreement "necessarily create[s] a presumption of arbitrability"). Indeed, BCBST acknowledges that it "has attempted to arbitrate its dispute in accordance with the requirements of the Policy." (Compl. ¶ 28.) In other words, there can be no dispute that Counts I and II assert claims subject to arbitration and must be stayed.

### D. BCS's Motion to Dismiss Counts III of BCBST's Complaint

As the arbitration clause in the parties' Policy is valid and enforceable, BCBST's motion for "a declaration that it is not obligated to arbitrate under the Policy" is necessarily dismissed with prejudice.

### E. BCBST's Motion for Summary Judgment on BCS's Petition to Compel Arbitration

For the same reason, BCBST's motion for summary judgment on BCS's Petition to Compel Arbitration is denied.

### CONCLUSION

Because BCBST has failed to establish a defense of impossibility and commercial frustration, BCBST's motion for summary judgment is denied and BCS's motion to compel arbitration is granted. Further litigation will be stayed pending the results of that arbitration.

ENTER:

Dated: September 20, 2007

REBECCA R. PALLMEYER
United States District Judge